# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## WESTERN DIVISION
### No. __:_____-CV-___-__

PHIL BERGER, in his official capacity as
President pro tempore of the North
Carolina Senate; TIM MOORE, in his
official capacity as Speaker of the North
Carolina House of Representatives,

       Plaintiffs,

       v.

UNITED STATES DEPARTMENT OF
JUSTICE; LORETTA E. LYNCH, in her
official capacity as Attorney General of
the United States; VANITA GUPTA, in
her official capacity as Principal Deputy
Assistant Attorney General,

       Defendants.

**COMPLAINT FOR
DECLARATORY RELIEF**

By: /s/  S. Kyle Duncan
S. KYLE DUNCAN*
GENE C. SCHAERR*
SCHAERR | DUNCAN LLP
1717 K Street NW, Suite 900
Washington, DC 20006
202-787-1060
E-mail: kduncan@schaerr-duncan.com
DC Bar No. 1010452
E-mail: gschaerr@schaerr-duncan.com
DC Bar No. 416638
*Attorneys for Plaintiffs*

*Appearing Pursuant to Local Civil Rule
83.1; notice of appearance to be filed*

By: /s/ Robert D. Potter, Jr.
ROBERT D. POTTER, JR.
ATTORNEY AT LAW
2820 Selwyn Avenue, #840
Charlotte, NC 28209
704-552-7742
E-mail: rdpotter@rdpotterlaw.com
NC Bar No. 17553
*Local Civil Rule 83.1 Counsel for
Plaintiffs*

May 9, 2016

**INTRODUCTION**

1.     When people find themselves in the intimate settings of public bathrooms, locker rooms, or showers, they expect to encounter only other people of the same biological sex. Until very recently, that simple expectation of bodily privacy would have been taken for granted. Yet when North Carolina sought to protect that expectation in law—by enacting the "Public Facilities Privacy and Security Act" (the "Act"), commonly known as HB2—a torrent of vicious criticism was unleashed against the State, its officials, and its citizens. The abuse has now reached its apex with the unprecedented threats by the United States Department of Justice ("Department"), the defendant here. Last week, the Department sent letters to North Carolina public officials and agencies informing them that, by complying with the Act, they were engaging in a "pattern or practice" of discrimination in violation of three federal civil rights laws. They were bluntly ordered to repudiate the Act within five calendar days—that is, by today—or else face enforcement actions that would drastically impact North Carolina, including the potentially catastrophic elimination of more than two billion dollars in federal funding. Instead of meekly complying, plaintiffs—the leaders of both chambers of the North Carolina General Assembly—have filed this declaratory judgment action.

2.     A declaratory judgment is urgently needed for two basic reasons. First, it is needed to vindicate the sovereign right of North Carolina's citizens to decide how best to protect their own bodily privacy and dignity in intimate public settings. Second, it is needed to instruct the Department in no uncertain terms that its

overbearing abuse of executive authority flouts our Constitution's limitations on federal power and tramples on the sovereign dignity of the States and their citizens.

3.     The ideological extremity—and utter unworkability—of the Department's position on the issues in this case is astonishing.  Unlike the people of North Carolina, the Department believes that the only valid approach to issues of gender dysphoria is to allow *anyone* to use *any* communal public bathroom, locker room, or shower based solely on that person's self-declared "gender identity." Never mind that no federal statute or regulation remotely requires the Department's policy.  Never mind that the Department's policy will inevitably lead to women and girls in public changing facilities encountering individuals who, whatever their gender identity, still have fully functional male genitals.  Never mind that the Department's policy, on its face, demands that North Carolina allow biologically male prison inmates who identify as females to take showers with biologically female inmates—which, besides being absurd and dangerous, also violates the Department's *own* federal prison regulations. Apparently, the Department believes that these obvious social costs are outweighed by the policy's purported psychological benefits to persons of conflicted gender identity.

4.     The people of North Carolina came to a different and far more sensible conclusion, one they enacted in the law at issue in this case. Despite being grossly mischaracterized in the media, the Act does not embody hostility towards those whose gender identity differs from their biological sex. To the contrary, the Act specifically allows a flexible system of single-occupancy facilities for persons who do

2

not wish to use public facilities designated for their biological sex. The Act also leaves in place existing provisions allowing a person to obtain a sex-change operation, make a corresponding change to their birth certificate, and then use the public facilities consistent with their new anatomy. And the Act allows *private* businesses and other entities to determine their own bathroom policies—including, if they wish, policies closer to the Department's views.

5.    But the Act also reflects concern and compassion for the many North Carolina residents—especially girls and women—who do not wish to be in close proximity to persons with genitals characteristic of the opposite sex when using public restrooms, locker rooms, and showers. Those people reasonably believe that a policy allowing people of the opposite biological sex into those spaces would be an assault on *their* dignity, privacy, and safety, and an affront to the legitimate and longstanding privacy expectations of all North Carolinians. That is why, in *publicly* owned facilities, the Act simply requires that everyone—regardless of their "gender identity" use the facilities that correspond to their current anatomy.

6.    In short, the Act is not, as it has been mischaracterized in the press, an "anti-transgender" law. It is, rather, a law that promotes both privacy and safety, while accommodating the legitimate interests of persons with conflicts between their biological and gender identities.

7.    Nonetheless, in a series of highly publicized and unusual letters sent to North Carolina officials and agencies last week, the Department announced its "determination" that the Act, *on its face*, violates three federal civil rights statutes—

Title VII, Title IX, and the Violence Against Women Act. As explained more fully elsewhere in this Complaint, the legal theories reflected in the Department's determination letters are gravely flawed. For example, those theories all rest on the implausible premise that a privacy policy expressly designed to *avoid* making distinctions based on gender identity—by relying on anatomy instead—nonetheless "facially" discriminates on the basis of gender identity. That is nonsensical.

8. More important for present purposes, the Department's "determination" that the Act violates these civil rights laws represents an all-out assault, not only on the sovereign right of North Carolinians to determine their own policies regarding public bath and shower facilities, but on the right of every other State and local government to do the same. It is a remarkable act of executive overreach, one that unnecessarily insists on political correctness at the expense of privacy and safety for other vulnerable citizens, especially women and girls.

9. Relatedly, the Department's "determination" is also an assault on the whole system of single-sex bathrooms that, precisely because of privacy concerns, has been an accepted part of our Nation's social compact since time out of mind. As a legal matter, if a biologically male individual can access a women's bathroom based on a claim of "gender identity," then *any* males can gain access on the same kind of claim, regardless of whether they "identify" as male or female: If discrimination based on "gender identity" is unlawful when the person seeking access identifies as a female, then it must be equally unlawful when that person identifies as a male. Furthermore, as a practical matter, if owners of public

bathrooms, lockers, and shower facilities cannot exclude persons with male genitals from women's bathrooms, soon enough the public will sensibly demand that single-sex bathrooms be abandoned altogether in favor of single-occupancy facilities.

10.     To be sure, owners of private bath, locker, and shower facilities may decide to move in that direction on their own. But state taxpayers should not be forced to shoulder the enormous costs of such a transition at the behest of federal officials who offer nothing more than policy arguments masquerading as law. Nor should innocent state residents be forced to endure the assault on their privacy that policy would produce in the interim.

11.     In sum, declaratory relief is urgently needed in this case. It is needed to protect the sovereignty of North Carolina's people to set public policy on sensitive and controversial matters of bodily privacy and security. It is needed to shield North Carolina from an open-ended threat of a potentially catastrophic loss of federal funding based on nothing more than the Department's novel and untested misreading of longstanding federal requirements. And it is needed to clarify that federal officials abuse their authority—and violate the Constitution—when they peremptorily order a sovereign State to abandon properly enacted legislation, as if North Carolina were nothing more than a tributary of the federal government.

## JURISDICTION AND VENUE

12.     The Court has jurisdiction under 28 U.S.C. § 1331 because the action arises under the United States Constitution and federal law.

13.     The Court may enter declaratory relief and any other appropriate relief under 28 U.S.C. § 2201 and § 2202.

14.     The Court may review agency action and enter declaratory and other appropriate relief under the Administrative Procedure Act, 5 U.S.C. §§ 702-706.

15.     Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

16.     Venue is also proper under 28 U.S.C. § 1391(e) because, in this action against officers and agencies of the United States, a substantial part of the events or omissions giving rise to this action occurred in this judicial district and because the Plaintiffs reside in this district and no real property is involved in this action.

## PARTIES

17.     Plaintiffs Phil Berger and Tim Moore serve as President pro tempore of the North Carolina Senate and as Speaker of the North Carolina House of Representatives, respectively. President pro tempore Berger and Speaker Moore lead the two chambers of the North Carolina General Assembly, which is constitutionally tasked with budgeting for the operation of all facets of state government and with enacting laws for the health, safety, and welfare of North Carolinians. Moreover, under North Carolina law, President Berger and Speaker Moore "jointly have standing to intervene on behalf of the General Assembly as a party in any judicial proceeding challenging a North Carolina statute or provision of the North Carolina Constitution." N.C. Gen. Stat. § 1-72.2-2.

18.     Defendant United States Department of Justice ("Department") is an executive agency of the United States and is responsible for the enforcement of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*, and the Violence Against Women Reauthorization Act of 2013, 42 U.S.C. § 13925, *et seq.*

19.     Defendant Loretta E. Lynch is the United States Attorney General. In this capacity she is responsible for the operation and management of the Department. She is sued in her official capacity only.

20.     Defendant Vanita Gupta is a Principal Deputy Assistant Attorney General at the United States Department of Justice and an official of the Civil Rights Division of the United States Department of Justice. She has been delegated the responsibility to bring an enforcement action under Title VII, Title IX, and VAWA against the State of North Carolina and its public agencies and officials. She has been sued in her official capacity only.

## FACTS

### I.     THE ACT

21.     On March 23, 2016, the General Assembly of North Carolina passed the "Public Facilities Privacy and Security Act" (the "Act"), commonly known as HB2. 2015 Bill Text NC H.B. 2B (Mar. 23, 2016), amending N.C. Gen. Stat. § 115C-47.

22.     As relevant here, the Act requires that a "multiple occupancy restroom or changing facility" operated by any "public agency" in North Carolina be

"designated for and only used by persons based on their biological sex." HB2, § 1.3(B).

23.    "Biological sex" is defined as "[t]he physical condition of being male or female, which is stated on a person's birth certificate." *Id.* § 1.3(A)(1).

24.    A "multiple occupancy restroom or changing facility" is defined as "[a] facility designed or designated to be used by more than one person at a time where persons may be in various states of undress in the presence of other persons" and "may include, but is not limited to, a restroom, locker room, changing room, or shower room." *Id.* § 1.3(A)(3).

25.    A "public agency" includes executive branch agencies; the legislative and judicial branches; political subdivisions; local and municipal governments; all state agencies, boards, offices and departments under the direction and control of a member of the council of state; and local boards of education. *Id.* § 1.3(4)(A)-(H); § 1.2.

26.    The Act, however, does not apply to any "single occupancy bathroom or changing facility," which is defined as "[a] facility designed or designated to be used by only one person at a time where persons may be in various states of undress," and includes "a single stall restroom designated as unisex or for use based on biological sex." *Id.* § 1.3(A)(5); § 1.2(A)(3).

27.    In fact, the Act expressly allows public agencies to "provid[e] accommodations such as single occupancy bathroom or changing facilities upon a person's request due to special circumstances[.]" *Id.* § 1.3(C); *see also id.* § 1.2(C)

(providing that "[n]othing in this section shall prohibit local boards of education from providing accommodations such as single occupancy bathrooms or changing facilities or controlled use of faulty facilities upon a request due to special circumstances").

28.     On April 12, 2016, Governor McCrory issued Executive Order No. 93, entitled "To Protect Privacy and Equality." Among other things, the Order (1) affirmed that "private businesses can set their own rules for their own restroom, locker room and shower facilities"; (2) confirmed that multiple-occupancy restroom, locker rooms, and shower facilities in cabinet agencies must comply with the Act; but (3) emphasized that "all cabinet agencies shall provide a reasonable accommodation of a single occupancy restroom, locker room or shower facility upon request due to special circumstances," and encouraged all "council of state agencies, cities, counties, the University of North Carolina System and the North Carolina Community College System" to make similar accommodations where practicable.

## II.     THE DEPARTMENT'S "DETERMINATION" LETTERS

29.     On May 4, 2016, the Department, through its Civil Rights Division, sent a letter to North Carolina Governor Patrick McCrory (the "McCrory Determination Letter").

30.     The McCrory Determination Letter stated that the Department had "determined" and "concluded" that, as a result of complying with the Act, Governor McCrory and the State of North Carolina were "in violation of Title VII of the Civil Rights Act of 1964" because the State was "engaging in a pattern or practice of

discrimination against transgender state employees and both you, in your official capacity, and the State are engaging in a pattern or practice of resistance to the full enjoyment of Title VII rights by transgender employees of public agencies."

31.     The McCrory Determination Letter explained that the Department had adopted the view that Title VII "applie[s] to discrimination against transgender individuals based on sex, including gender identity," and that Title VII requires "[a]ccess to sex-segregated restrooms and other workplace facilities consistent with gender *identity*." The letter further stated that under Title VII such "access … is a term, condition, or privilege of employment."

32.     The McCrory Letter concluded that "H.B. 2 ... is *facially discriminatory* against transgender employees on the basis of sex because it treats transgender employees, whose gender identity does not match their 'biological sex,' as defined by H.B. 2, differently from similarly situated non-transgender employees" (emphasis added). The letter further informed the Governor that, given the State's "pattern and practice" of Title VII discrimination, the Attorney General "may apply to the appropriate court for an order that will ensure compliance with Title VII."

33.     Finally, the McCrory Determination Letter ordered the Governor to "advise" the Department "no later than close of business on May 9, 2016" whether he would "remedy these violations of Title VII, including by confirming that the State will not comply with or implement H.B. 2, and that it has notified employees of the State and public agencies that, consistent with federal law, they are

permitted to access bathrooms and other facilities consistent with their gender identity."

34.     Also on May 4, 2016, the Department, through its Civil Rights Division, sent a letter to North Carolina Department of Public Safety ("DPS") Secretary Frank Perry (the "Perry Determination Letter").

35.     The Perry Determination Letter "concluded" that the North Carolina DPS was in violation of Title VII, for the same reasons as those outlined in the McCrory Determination Letter.

36.     In addition, the Perry Determination Letter "concluded" that DPS, as a receiver of federal funds from the Office on Violence Against Women ("OVW") "is in violation of the Violence Against Women Reauthorization Act of 2013" ("VAWA").

37.     The Perry Determination Letter went on to allege that compliance with VAWA requires that any "individual" in "buildings controlled or managed by DPS or its sub-recipients"—buildings which would obviously include prisons throughout the State—be permitted "to access bathrooms and other facilities consistent with their gender identity."

38.     Finally, the letter ordered Secretary Perry to "advise" the Department "no later than close of business on May 9, 2016" whether DPS has "remedied these violations to comply fully with Title VII and VAWA, including by confirming that DPS will not comply with H.B. 2, and that it has notified individuals and employees at facilities controlled or managed by DPS or its sub-recipients that, consistent with

federal law, they are permitted to access bathrooms and other facilities consistent with their gender identity."

39. Also on May 4, 2016, the Department, through its Civil Rights Division, sent a letter to the President of the University of North Carolina, Margaret Spellings (the "UNC Determination Letter").

40. The UNC Determination Letter "determined" that UNC was in violation of Title VII and VAWA, for the same reasons as those outlined in the McCrory and Perry Determination Letters.

41. In addition, the UNC Determination Letter "determined" that UNC was in violation of Title IX because of UNC's compliance with the Act.

42. Finally, the UNC Determination Letter ordered UNC President Margaret Spellings to "advise" the Department "no later than close of business on May 9, 2016" whether UNC has "remedied these violations to comply fully with Title IX and VAWA, as well as its obligations as an employer under Title VII, including by . . . advising the public, including UNC students, employees, and third parties that, in accordance with federal law, individuals are permitted to access UNC restrooms and other facilities consistent with their gender identity." The UNC Determination Letter threatened "enforcement action" if UNC failed to comply with the Department's order.

43. The Department's letters are calculated, not only to prevent North Carolina public officials from enforcing or implementing the Act, but also to pressure the North Carolina General Assembly into repealing the Act. Accordingly,

the Department's letters harm these plaintiffs as well as other members of the General Assembly.

## III. THE DEPARTMENT'S LETTERS CONSTITUTE FINAL AGENCY ACTION UNDER THE APA.

44.    The Department of Justice is a federal agency for purposes of the Administrative Procedures Act ("APA"). 5 U.S.C. § 701(b).

45.    Under the APA, a court may review agency decisions that constitute "final agency action." 5 U.S.C. § 704.

46.    Generally, an agency action is final when it "mark[s] the 'consummation' of the agency's decisionmaking process" and [is] one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow[.]'" *Bennett v. Spear,* 520 U.S. 154, 177-78 (1997) (internal citations omitted).

47.    Final agency action may take the form of a letter announcing the agency's position on a substantive legal matter. "[A]n agency may not avoid judicial review merely by choosing the form of a letter to express its definitive position on a general question of statutory interpretation." *Ciba-Geigy Corp. v. United States EPA*, 801 F.2d 430, 438 n.9 (1986); *accord CSI Aviation Servs. v. US DOT,* 637 F.3d 408, 412 (D.C. Cir. 2011) (citing *Ciba-Geigy*).

48.    Indeed, "a letter from an agency official stating the agency's position and threatening enforcement action constitute[s] final agency action[.]" *Barrick Goldstrike Mines, Inc. v. Browner*, 215 F.3d 45, 48 (D.C. Cir. 2000); *see also CSI Aviation Servs.*, 637 F.3d at 412 (finding final agency action where DOT "warning letter" constituted a "definitive statement of the agency's legal position"). That is

especially true where the letter "declare[s] in no uncertain terms" the agency's position on "a purely legal" question of "statutory interpretation." *CSI Aviation Servs.,* 637 F.3d at 412

49.     Yet another indication that such action is final is when an actor's "only alternative to obtaining judicial review is to violate [the agency's] directives, … and then defend an enforcement proceeding." *Barrick Goldstrike Mines*, 215 F.3d at 49; *see also CSI Aviation Servs.*, 637 F.3d at 412 (finding final agency action where DOT "cease and desist" letter "put the [plaintiff] to the painful choice between costly compliance and the risk of prosecution at an uncertain point in the future"). And that is especially true when the consequences of not complying with the agency demand are great. *See, e.g., CSI Aviation Servs.,* 637 F.3d at 412 (finding final agency action where DOT enforcement letter "imposed an immediate and significant burden on [the recipient]" and "cast a cloud of uncertainty over the viability of [the recipient's] ongoing business").

50.     The Department's Determination Letters to McCrory, Perry, and Spellings constitute reviewable final agency action under the APA.

51.     All three letters reflect a settled and definitive agency position. The letters note that the Department has "concluded" and "determined" that the State of North Carolina, and its public agencies and officials, are actively violating federal law.

52.     All three letters unambiguously threaten enforcement action against North Carolina and its public agencies and officials absent compliance. Each

explains that the Attorney General—who is responsible for actions taken by the Department, including the letters—may apply for a court order to seek enforcement of the federal statutes at issue absent compliance by North Carolina and its public agencies and officials.

53.     All three letters indicate the Department's clear and settled position that, absent compliance by the State and its public agencies and officials, the Department's next step is not to seek further discussions or commence a factual investigation, but rather to bring an enforcement action.

54.     The letters unambiguously alter the legal positions of North Carolina, and its public agencies and officials, by putting them to the choice of ceasing to enforce the Act or facing a federal enforcement proceeding.

55.     The letters directly harm the State and its public agencies and officials by requiring them to yield their responsibility as officers of a sovereign state to enforce the Act, or face federal enforcement proceedings. Furthermore, the letters directly harm plaintiffs by disrupting the work of the North Carolina General Assembly in safeguarding the privacy and safety of North Carolina's citizens and in establishing the budget for North Carolina's public agencies and programs.

56.     The letters take a definitive position on a purely legal question of statutory interpretation.  None of the letters suggest that any additional factual inquiry needs to take place. Moreover, the letters assert that the Act violates the relevant federal laws, not just as applied in particular circumstances, but facially.

57.     Finally, as noted, the letters are calculated, not only to prevent North Carolina public officials from enforcing or implementing the Act, but also to pressure the North Carolina General Assembly into repealing the Act. Accordingly, the Department's letters harm the plaintiffs as well as other members of the General Assembly.

## IV.     THE DETERMINATION LETTERS' ADVERSE EFFECTS

58.     The Department's stunningly overbroad and conclusory determinations that the Act "facially violates" Title VII, Title IX, and VAWA place plaintiffs and the State of North Carolina in an intolerable position that threatens to disrupt the integrity of its public agencies, the financial stability of its universities and school systems, and, most profoundly, the ability of its public officials to provide for the common good of North Carolina citizens.

59.     On the one hand, if plaintiffs and other legislators in the North Carolina General Assembly and the State's public agencies and officials resist the Department's demands and continue implementing the will of the citizenry as expressed in the Act, the State's school systems could lose hundreds of millions of dollars of federal education funds. Such a loss would not only impair the teaching and research mission of UNC, but would also affect K-12 education throughout the State. Local schools would likely be forced to curtail programs, fire teachers and increase class sizes—all to the detriment of the State's hundreds of thousands of schoolchildren. All this because the federal government, if the Department carries

out its threat, would refuse to return to the people of North Carolina federal tax dollars that those very people have paid into the federal treasury.

60.    Similarly, the Department's demands carry a threat to cut off over $100 million in annual federal funding currently provided to the State's Department of Public Safety.  Here again, these are funds that North Carolina citizens have already paid into the federal treasury in the form of tax payments.  Yet the Department's Determination Letters implicitly threaten to withhold those funds—which could lead to more crowding of North Carolina's prisons, reduced numbers of prisons guards, and thus an increased risk of crime both inside and outside those prisons.

61.    On the other hand, if plaintiffs and other legislators in the North Carolina General Assembly, or any of the State's public agencies and officials, capitulate to the Department's demands, this would subject the people of North Carolina to the very risks the Act was designed to prevent.  As previously explained, the Department demands that the State allow *anyone* to use *any* public bathroom, locker room or shower based solely on that person's self-declared gender "identity."  Such a policy would necessarily lead to partially or fully unclothed women and girls coming into close proximity and visual contact with individuals who, whatever their gender identity, nonetheless display male sex organs.

62.    Such a policy would also create an opportunity for sexual predators of any sexual orientation to abuse the policy to facilitate their predation.  And in so doing, such a policy would violate settled, legitimate expectations of privacy and

safety that have long prevailed in the State. Indeed, under the Department's legal theory, a biological male found in a woman's restroom has a legal right to be there if he merely *claims* to "self-identify" as female. And a police officer summoned to remove such a person in a public restroom, locker room, or shower would have no practical way to determine quickly whether the person is acting in bad faith.

63.   Before long, moreover, such a policy would likely provoke a public outcry demanding that single-sex facilities be abandoned altogether and replaced with single-user bathroom, shower and locker facilities. That in turn would likely force the plaintiffs and other members of the General Assembly to authorize funding to retrofit countless public buildings, at a taxpayer cost of hundreds of millions if not billions of dollars.

64.   In the prison setting, the consequences of capitulation to the Department's demands would be equally if not more stark. The Department's demand with respect to prisons is not limited to prison employees, but extends to inmates as well—all "individuals" in those prisons. If, as the Department apparently insists, prison officials cannot "discriminate" based on anatomy in granting access to bath, locker and shower facilities, then they cannot, for example, exclude biological males from female bath and shower facilities. And that inability would create an obvious risk of more sexual assaults and increased voluntary sexual activity—thereby leading to more prison pregnancies and sexually transmitted diseases. These effects would likewise impose massive additional costs

on the State's prison system—costs that would require further action by plaintiffs and other members of the General Assembly.

65.    Nor would the effects of a capitulation be limited to *publicly* owned bath, locker-room and shower facilities.  If as the Department contends, Title VII requires that anyone be allowed to use any such facility based on their asserted sexual orientation, that rule necessarily applies to private as well as public employers and, indeed, businesses generally.  There is only one Title VII standard. And if the Department succeeds in imposing its view of Title VII on the State itself, it will be only a short step to imposing that view on virtually every owner of bath, locker and shower facilities throughout the State and, indeed, throughout the Nation.

66.    In all these ways, if North Carolina and its public agencies and officials, including plaintiffs, were to capitulate to the Department's demands, they would violate the trust of the North Carolina citizenry to protect their privacy and safety.

## CLAIMS FOR RELIEF

### CLAIM ONE:
### The Act Does Not Facially Violate Title VII, Properly Construed

67.    Plaintiffs reallege all matters alleged in paragraphs 1 through 66 and incorporate them herein.

68.    For several reasons, the Department's determination that the Act facially violates Title VII is wrong as a matter of both law and proper procedure.

This will be established in greater detail (with appropriate citations) in briefing on the merits. But following are a few of the salient reasons.

69. First, at the threshold, the Department's premise that the Act "facially discriminates" on the basis of gender "identity" is patently incorrect. On the face of the Act, a person's ability to use a particular multi-occupancy bathroom, locker room or shower facility depends, *not* on the person's gender identity, but on the person's "biological sex"—as determined by the person's birth certificate. *See* HB2 §§ 1.2, 1.3. Accordingly, if there is any "discrimination" here, it is discrimination on the basis of biological sex, not gender identity. And, although a "separate but equal" approach is clearly inappropriate with respect to racial classifications, separating the sexes based on legitimate physical and anatomical characteristics has always been viewed as consistent with Title VII and other non-discrimination statutes – especially in the context of bathrooms, locker rooms and showers.

70. Moreover, North Carolina law expressly allows citizens to obtain sex change operations, and then change the sex listed on their birth certificates. *See* N.C. Gen. Stat. Ann. § 130A-118. Thus, for example, a person who was a male at birth but who "identifies" as female has the ability to gain access to women's bathrooms if (s)he so chooses. Accordingly, there simply is no "facial discrimination" against anyone based on their gender identity.

71. Second, and more fundamentally, the Department is incorrect in contending that Title VII's prohibition on discrimination on the basis of "sex" extends to discrimination on the basis of "gender *identity*" or even sexual

orientation. Although that position has recently (and controversially) been adopted by the current Equal Employment Opportunity Commission for claims brought before that agency, the same position has been uniformly rejected by every federal circuit court to consider it, and by virtually all of the district courts as well. (The court cases cited in the Department's letters deal with sex and gender *stereotyping,* not gender identity or sexual orientation per se, and are therefore not controlling on the questions here.) Nor is there any indication in Title VII's language or legislative history of any purpose on Congress's part to reach alleged discrimination on the basis of gender identity.

72. Third, because Congress's decision to extend Title VII to the states rested solely upon Section 5 of the Fourteenth Amendment, any requirements imposed on the states under the guise of that statute must be directed at preventing or remedying violations of the federal Constitution, and must be both "congruent with and proportional" to that goal. Yet the Department does not even contend— nor could it contend—that people with a gender identity different from their biological sex are a protected class, much less that extending Title VII to laws such as the Act is congruent and proportional to the goal of preventing *unconstitutional* discrimination against members of that class. Accordingly, given that it is grounded solely in the Fourteenth Amendment, Title VII cannot constitutionally be applied to the Act or similar laws, and therefore cannot constitutionally be construed in the manner the Department contends.

73. Fourth, in any event, the federal government lacks the constitutional authority to preempt the States' efforts to protect the privacy and safety of residents using State-owned bathroom, locker room and shower facilities. Providing such protection in State-owned facilities falls squarely within the police power protected from federal encroachment by the enumerated powers doctrine and recognized in the Tenth Amendment. And the use of such facilities by people who "identify" with a gender other than their biological sex cannot possibly have an impact on interstate commerce sufficient to justify federal regulation under Article I. Indeed, the Department's determination under Title VII constitutes an improper attempt to commandeer State-owned property in pursuit of a (dubious) federal policy. For that reason too Title VII cannot constitutionally be construed in the manner the Department contends.

74. Finally, even if the Act could hypothetically violate Title VII (properly construed) in *some* of its possible applications, it cannot possibly be unlawful in all of its possible applications, and for that reason cannot be facially unlawful. For example, even under the Department's interpretation of Title VII, the Act would be lawful when applied to prevent a known male sexual predator from falsely claiming to "identify" as female so that he can enter a women's bathroom and prey upon a little girl whom he has seen enter alone. Surely the Department's interpretation of Title VII would not require that people making knowingly false claims of gender identity (and claims that are known to authorities to be false) be allowed to enter a bathroom or shower designated for people of the opposite sex. Because the Act

prevents entry into facilities designated for people of the opposite sex by those making knowingly false claims of gender identity in addition to those making genuine claims of gender identity, the Act clearly is not unlawful in *all* of its applications, and therefore is not unlawful on its face.

75.    For all these reasons, the Department's determination that the Act facially violates Title VII is both "contrary to law" and "arbitrary and capricious" within the meaning of the APA.  Furthermore, the Department violated the APA and the due process rights of the plaintiffs and the State by reaching its determination without any advance notice or opportunity to be heard.

## CLAIM TWO:
### The Act Does Not Facially Violate Title IX, Properly Construed

76.    Plaintiffs reallege all matters alleged in paragraphs 1 through 75 and incorporate them herein.

77.    For several reasons, the Department's determination that the Act facially violates Title IX is wrong as a matter of both law and proper procedure. This will be established in greater detail (with appropriate citations) in briefing on the merits.  But following are a few of the salient reasons.

78.    First, at the threshold, the Department's premise that the Act "facially discriminates" on the basis of gender "identity" is patently incorrect.  On the face of the Act, a person's ability to use a particular multi-occupancy bathroom, locker room or shower facility depends, *not* on the person's gender identity, but on the person's "biological sex"—as determined by the person's birth certificate.  *See* HB2 §§ 1.2, 1.3.  Accordingly, if there is any "discrimination" here, it is discrimination on

the basis of biological sex, not gender identity. And, although a "separate but equal" approach is clearly inappropriate with respect to racial classifications, separating the sexes based on legitimate physical and anatomical characteristics has always been viewed as consistent with Title IX and other non-discrimination statutes – especially in the context of bathrooms, locker rooms and showers.

79. This conclusion is particularly evident with respect to Title IX, which both by statute and regulation expressly authorizes the provision of facilities or programs segregated by sex, provided each is comparable for males and females. *See, e.g.,* 20 U.S.C. § 1686 (allowing educational institutions to "maintain[ ] separate living facilities for the different sexes"); 34 C.F.R. § 106.32 (allowing funding recipients to "provide separate housing on the basis of sex," provide those facilities are "[p]roportionate in quantity" and "comparable in quality and cost"); 34 C.F.R. § 106.34 (allowing "separation of students by sex" within physical education classes and certain sports "the purpose or major activity of which involves bodily contact"). Most pertinent here, longstanding Title IX regulations issued by the Department of Education in 1975, and reaffirmed in 1980, expressly allow recipients of federal funding to "provide separate toilet, locker room, and shower facilities on the basis of sex," provided that the facilities provided for "students of one sex" are "comparable" to the facilities provided for "students of the other sex." 34 C.F.R. § 106.33.

80. In light of that, the Department is plainly wrong to conclude that, by complying with the Act, the plaintiffs are thereby engaging in a "pattern or practice of discrimination" under Title IX. By requiring public multiple-occupancy

bathrooms, locker rooms, and showers to be segregated by "biological" sex, the Act has done nothing remotely out of line with the clear statutory and regulatory directives in Title IX. To the contrary, the Act is *authorized* by the most directly applicable Title IX regulation, which allows sex-segregated "toilet[s], locker room[s], and shower facilities." 34 C.F.R. § 106.33.

81.     Second, and more fundamentally, the Department is incorrect in contending that Title IX's prohibition on discrimination on the basis of "sex" extends to discrimination on the basis of "gender identity." There is no indication in Title IX's language or legislative history of any purpose on Congress's part to reach alleged discrimination on the basis of gender identity. Furthermore, that view has been uniformly rejected by every federal circuit court to consider it, and by virtually all of the district courts as well. (The court cases cited in the Department's letters deal with sex and gender *stereotyping,* not gender identity or sexual orientation per se, and are therefore not controlling on the questions here.)

82.     Third, the Department compounds its erroneous reading of Title IX by relying on a recent Department of Education "opinion letter" suggesting that Title IX's prohibition on "sex" discrimination extends to discrimination based on "gender identity." *See* Letter from James A. Ferg-Cadima, Acting Deputy Assistant Secretary for Policy, Office for Civil Rights, U.S. Dep't of Education (Jan. 7, 2015). The Department is mistaken. Even assuming the Fourth Circuit was correct in determining recently that a mere "opinion letter" merits deference, *see G.G. v. Gloucester County School Board*, 2016 U.S. App. LEXIS 7026 (4th Cir. Jan. 27,

2016), the Department nonetheless cannot prevail here because the opinion letter is plainly erroneous, inconsistent with Title IX and its regulations, and would render Title IX unconstitutional. *See id.*, 2016 U.S. App. LEXIS at 23 (explaining that agency interpretation of Title IX regulation merits deference under *Auer v. Robbins*, 519 U.S. 452 (1997), unless interpretation is "plainly erroneous or inconsistent with the regulation or statute"); *id.* at 32 (observing that there was "no constitutional challenge to the regulation or agency interpretation").

83.     The opinion letter's notion that "sex" discrimination encompasses "gender identity" discrimination is plainly erroneous and inconsistent with both Title IX and its implementing regulations. Among other things, it would render incoherent Title IX's longstanding and express allowance of sex-segregated facilities and programs.    More fundamentally, the opinion letter's interpretation would render Title IX unconstitutional: as explained below, it would require States to violate persons' constitutional rights to bodily privacy and parents' constitutional rights to direct the education and upbringing of their children; it would violate the Spending Clause and the Tenth Amendment by conditioning States' receipt of federal funds on a novel requirement that no State could have reasonably foreseen; and it would violate the constitutional separation of powers by purporting to enact new legislation outside the constraints of Article I of the Constitution.

84.     Moreover, *Gloucester* does not purport to decide the actual question at issue in this case—namely, whether Title IX *itself* is facially violated if a State limits public multiple-occupancy restrooms, changing facilities, and showers to

persons of the same biological sex (while permitting a system for accommodating persons with conflicting gender identities through single-occupancy facilities). *Gloucester* did not reach that issue (and, indeed, had nothing to do with changing facilities or showers at all), but decided only that a Department of Education opinion letter purporting to interpret an implementing regulation under Title IX merits *Auer* deference, absent a showing that the letter is plainly erroneous, inconsistent with Title IX, or unconstitutional. *Gloucester* remanded for further proceedings on the Title IX issue, leaving open the ultimate question of whether Title IX facially permits a State to require public multiple-occupancy restrooms, changing facilities, and showers to be segregated by biological sex (while permitting a system for accommodating persons with conflicting gender identities through single-occupancy facilities).

85. In addition, the Fourth Circuit's *Gloucester* opinion is incorrect. An agency can impose new obligations or prohibitions on regulated parties only through notice-and-comment rulemaking—not through a unilateral "opinion letter." Thus, the Department cannot rely on the "opinion letter" to re-cast Title IX's prohibition on "sex" discrimination as a prohibition on "gender identity" discrimination. Instead, the Department can only rely on the plain meaning of Title IX and its implementing regulations, which for decades have unambiguously permitted sex-segregated restrooms, changing rooms, and shower facilities.

86. Fourth, the federal government lacks the constitutional authority to deploy the Department's novel reading of Title IX to preempt the States' efforts to

protect the privacy and safety of residents using public bathroom, locker room and shower facilities.  Indeed, the Department's reading of Title IX would *compel* States to violate persons' constitutional rights to bodily privacy and parents' constitutional rights to direct the education and upbringing of their children with respect to matters of sexuality. The Department's reading of Title IX would therefore infringe the States' Tenth Amendment authority to provide for their citizens' privacy and well-being, and would additionally constitute an unconstitutional commandeering of state property and lawmaking processes. For those reasons, too, Title IX cannot constitutionally be construed in the manner the Department contends.

87.    Fifth, the Department's novel reading of Title IX to encompass "gender identity" discrimination would make Title IX run afoul of the Spending Clause and the Tenth Amendment. The conditions the federal government attaches to the States' receipt of federal funds must be clear and unambiguous, so that States may make an informed choice about whether to accept the funds. No State could have reasonably foreseen that a condition on accepting federal funds prohibiting "sex" discrimination would somehow evolve through unilateral agency action into a prohibition on "gender identity" discrimination—particularly when Title IX's longstanding regulations expressly allow States to maintain sex-segregated restrooms, locker rooms, and shower facilities.  Furthermore, by exposing the State to a potentially catastrophic loss of federal funding if the State did not acquiesce in the agency's novel reading of Title IX, the Department would violate the Tenth Amendment.

88.     Finally, even if the Act could hypothetically violate Title IX (properly construed) in *some* of its possible applications, it cannot possibly be unlawful under Title IX in all of its possible applications, and for that reason cannot be facially unlawful.  For example, even under the Department's interpretation of Title IX, the Act would be lawful when applied to prevent a known male sexual predator from falsely claiming to "identify" as female so that he can enter a women's bathroom and prey upon a little girl whom he has seen enter alone.  Surely the Department's interpretation of Title IX would not require that people making knowingly false claims of gender identity (and claims that are known to authorities to be false) be allowed to enter a bathroom or shower designated for people of the opposite gender. Because the Act prevents entry into facilities designated for people of the opposite sex by those making knowingly false claims of gender identity in addition to those making genuine claims of gender identity, the Act clearly is not unlawful in *all* of its applications, even under the Department's interpretation of Title IX, and therefore is not unlawful on its face.

89.     For all these reasons, the Department's determination that the Act facially violates Title IX is both "contrary to law" and "arbitrary and capricious" within the meaning of the APA.  Furthermore, the Department violated the APA and the due process rights of the plaintiffs and the State by reaching its determination without any advance notice or opportunity to be heard.

## CLAIM THREE:
## The Act Does Not Facially Violate VAWA, Properly Construed

90.     Plaintiffs reallege all matters alleged in paragraphs 1 through 89 and incorporate them herein.

91.     For several reasons, the Department's determination that the Act facially violates VAWA is wrong as a matter of both law and proper procedure.  This will be established in greater detail (with appropriate citations) in briefing on the merits.  But following are a few of the salient reasons.

92.     First, at the threshold, the Department's premise that the Act "facially discriminates" on the basis of gender "identity" is patently incorrect.  On the face of the Act, a person's ability to use a particular multi-occupancy bathroom, locker room or shower facility depends, *not* on the person's gender identity, but on the person's "biological sex"—as determined by the person's birth certificate.  *See* HB2 §§ 1.2, 1.3.  Accordingly, if there is any "discrimination" here, it is discrimination on the basis of biological sex, not gender identity.  And, although a "separate but equal" approach is clearly inappropriate with respect to racial classifications, separating the sexes based on legitimate physical and anatomical characteristics has always been viewed as consistent with VAWA and other non-discrimination statutes – especially in the context of bathrooms, locker rooms and showers.

93.     Second, VAWA itself dispels any notion that the Act facially violates VAWA's grant conditions. As the Department's letter fails to note, VAWA explicitly allows funding recipients to consider an individual's sex in establishing sex-segregated or sex-specific programming. While VAWA does prohibit discrimination

in funded programs on the basis of "sex" and "gender identity," 42 U.S.C. § 13925(b)(13)(A), the statute contains an "exception" that allows funded programs to consider an individual's sex "[i]f sex-segregation or sex-specific programming is necessary to the essential operation of a program." *Id.* § 13925(b)(13)(B). A program grantee satisfies VAWA requirements in such cases "by providing comparable services to individuals who cannot be provided with the sex-segregated or sex-specific programming." *Id.*

94.     In light of VAWA's explicit safe-harbor for sex-segregated and sex-specific programs, the Department is plainly wrong to conclude that, by complying with the Act, Perry and the North Carolina DPS are "in violation of the non-discrimination provision of [VAWA]." By requiring public multiple-occupancy bathrooms, locker rooms, and showers in North Carolina correctional facilities to be segregated by "biological" sex, the Act has done nothing remotely out of line with the clear grant conditions in VAWA. To the contrary, the Act is *authorized* by the most directly applicable VAWA grant condition, which allows grantees to consider an individual's sex where, as here, "sex segregation or sex-specific programming is necessary to the essential operation of a program." *Id.*   For reasons explained elsewhere, and as a matter of common sense, sex segregation in multi-user bathrooms, locker rooms and shower facilities is "necessary to the essential operation" of such facilities.

95.     Third, the fact that the alleged VAWA violation in this case concerns North Carolina prison inmates make the Department's conclusion astonishing.  The

Department's determination plainly extends, not just to prison employees, but to any "individual" in "buildings controlled or managed by DPS or its sub-recipients," and it orders Perry to allow those individuals to "access restrooms and changing facilities that are consistent with their gender identity." Thus, by the plain terms of its determination letter, the Department has concluded that any North Carolina correctional facility receiving any VAWA funding must allow prison inmates to access restrooms and changing facilities (as well as showers, which the Department fails to mention) consistent with their "gender identity" or else be subject to a Department enforcement action.

96.     The Department cites not a single authority to support its reading of VAWA's grant condition, and for good reason—the consequences of the Department's position would fly in the face of every sensible notion of prison management, security, and safety. North Carolina correctional facilities would be required to allow any biologically male prison inmate whose *self-expressed* "gender identity" is female to use communal bathrooms, changing facilities, and showers with biologically female prison inmates—and vice-versa. The mere statement of that conclusion is sufficient to refute it.

97.     Fourth, the Department's conclusion that North Carolina correctional facilities violate VAWA by refusing to allow "gender identity" to determine inmate use of communal restrooms, changing facilities, and showers contradicts the Department's own prison regulations. In regulations entitled "Prison Rape Elimination Act National Standards," the Department requires that, in deciding

whether to assign "a transgender or intersex inmate" to a male or female prison facility, or in making other "housing and programming assignments" for such inmates, the agency "shall consider *on a case-by-case basis* whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems." 28 C.F.R. § 115.42(c) (emphasis added). Furthermore, the Department's regulations also require that "[t]ransgender and intersex inmates shall be given the opportunity to shower *separately* from other inmates." *Id.* § 115.42(f) (emphasis added). Neither of those regulations would survive the Department's current view of VAWA, as expressed in its determination letter, which would now require inmates to be allowed access restrooms, changing facilities, and showers consistent with their self-professed "gender identity," quite apart from any case-by-case assessment of whether such access would impact prison security or imperil the inmate's safety.

98.    Fifth, if the Department's conclusion regarding VAWA were correct, then VAWA would be unconstitutional on numerous grounds.  It would violate the Tenth Amendment by invading the State's basic constitutional authority to provide for order and safety in its correctional facilities. It would violate the Spending Clause by placing a condition on the receipt of federal funds that no State could have remotely anticipated when receiving the funds—especially in light of the Department's own regulations. For similar reasons, the Department's new position would violate the Tenth Amendment by coercing North Carolina to alter the basic structure of its correctional facilities or else lose large amounts of federal prison

funding. It would also require North Carolina to violate its own prisoners'
constitutional rights to bodily privacy and safety and expose them to dangerous
conditions in violation of the Eighth Amendment.

99.     Finally, even if the Act could hypothetically violate VAWA (properly
construed) in *some* of its possible applications, it cannot possibly be unlawful in all
of its possible applications, and for that reason cannot be facially unlawful.  For
example, even under the Department's interpretation of VAWA, the Act would be
lawful when applied to prevent biologically male prisoner from falsely claiming to
"identify" as female so that he can enter a communal bathroom, changing facility, or
shower in order to victimize biologically female prisoners.  Surely the Department's
interpretation of VAWA would not require that people making knowingly false
claims of gender identity (and claims that are known to authorities to be false) be
allowed to enter a bathroom or shower designated for people of the opposite sex.
Because the Act prevents entry into facilities designated for people of the opposite
sex by those making knowingly false claims of gender identity in addition to those
making genuine claims of gender identity, the Act clearly is not unlawful in *all* of its
applications, even under the Department's apparent view of VAWA, and therefore is
not unlawful on its face.

100.   For all these reasons, the Department's determination that the Act
facially violates VAWA is both "contrary to law" and "arbitrary and capricious"
within the meaning of the APA.  Furthermore, the Department violated the APA

and the due process rights of the plaintiffs and the State by reaching its determination without any advance notice or opportunity to be heard.

## CLAIM FOUR:
## The Department's Actions Violate the Separation of Powers in the United States Constitution

101.   Plaintiffs reallege all matters alleged in paragraphs 1 through 100 and incorporate them herein.

102.   Multiple provisions of the federal Constitution make clear that, if the federal government is to impose new legal requirements on the States, those requirements must be imposed by or at the behest of Congress, not by the Executive Branch acting on its own.   Those provisions include but are not limited to the "vesting" clause of Article I Section 1, the bicameralism and presentment clauses of Article I Section 7, the "take care" clause of Article II Section 3, and the "appropriate legislation" provision of Section 5 of the Fourteenth Amendment.

103.   The requirement that the Department's "determination" seeks to impose upon North Carolina—i.e., a requirement of open "access" to all state-owned "sex-segregated … facilities consistent with gender identity" (McCrory Determination Letter at 1)—is a new legal requirement.   For reasons explained above, that requirement—which would logically extend to every other State and virtually all private employers as well—is simply not found in Title VII, Title IX or VAWA.   The Department's attempt to impose that requirement on North Carolina on its own is therefore a usurpation of Congress's exclusive authority under Article I of the Constitution, which provides that "all legislative powers herein granted shall be vested in … Congress."   Such action is also a violation of the President's

obligation under Article II Section 3 to "take care that the laws be *faithfully* executed."

104.  For all these reasons, the Department's determination that North Carolina and its officials must grant "access to sex-segregated restrooms and other [similar] facilities consistent with gender *identity*" is both "contrary to law" and "arbitrary and capricious" within the meaning of the APA.  Furthermore, the Department violated the APA and the due process rights of the plaintiffs and the State by reaching its determination without any advance notice or opportunity to be heard.

## CLAIM FIVE:
### The Department's Actions Violate the Federalism Guarantees of the United States Constitution

105.  Plaintiffs reallege all matters alleged in paragraphs 1 through 104 and incorporate them herein.

106.  Several provisions of the federal Constitution also make clear that the States remain independent sovereigns in the federal system, that they joined the Union with their sovereignty—including their traditional police power—intact, and that the federal government is one of limited, enumerated powers.  Those provisions include but are not limited to Article I section 8, and section 1 of the Thirteenth, Fourteenth and Fifteenth Amendments—all of which together delineate specific and limited subjects on which Congress may legislate—and the Tenth Amendment, which provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."  Aside from racial discrimination, none of those

provisions authorizes any arm of the federal government to impose requirements for "access" to state-owned bathrooms, locker rooms or shower facilities, much less authorizes the federal government to regulate the manner in which the states seek to protect the privacy and safety of those using such state-owned facilities. Certainly nothing in the Constitution authorizes any arm of the federal government to impose regulations governing access to such facilities on the basis of "gender identity"—a concept unknown to those who wrote and ratified the relevant provisions of the federal Constitution.

107.    The Act, by contrast, seeks to vindicate the right to sexual and reproductive privacy protected by the Fifth and Fourteenth Amendments, as well as the right of parents to direct the upbringing of their children, also protected by the Fifth and Fourteenth Amendments.  And the Act does so in a manner that is well within the States' traditional police power.

108.    Because the federal government lacks the constitutional authority to regulate North Carolina's (and the other States') efforts to protect the privacy and safety of those who use state-owned bath, locker room and shower facilities, the Department's attempt to impose the "access" requirement at issue here represents a usurpation of the States' authority over such facilities.

109.    Relatedly, the Constitution's federalism guarantees constrain the federal government's ability to place conditions on the States' receipt of federal funds through legislation under the Spending Clause of Article I. The federal government must make its conditions on receipt of federal funds clear and

unambiguous, so that States may make an informed decision about whether to accept the funds and the resulting diminution in their sovereign authority. Furthermore, the federal government may not attach conditions to the receipt or retention of federal funding that effective coerce the States into accepting the conditions.

110. Based on those settled principles, the Department's attempt to impose novel and unforeseeable interpretations of Title IX and VAWA on North Carolina constitutes a violation of the Spending Clause and the Tenth Amendment. When North Carolina officials and agencies accepted the conditions originally attached to federal funding under those statutes, they could not have foreseen the radical change in those conditions represented by the Department's recent determination letters. Furthermore, by deeming North Carolina in violation of its novel reinterpretation of Title IX and VAWA, the Department has attempted to coerce North Carolina into complying with the Department's illegal demand, in violation of the Tenth Amendment.

111. For all these reasons, the Department's determination that North Carolina and its officials must grant "access to sex-segregated restrooms and other [similar] facilities consistent with gender *identity*" is both "contrary to law" and "arbitrary and capricious" within the meaning of the APA. Furthermore, the Department violated the APA and the due process rights of the plaintiffs and the State by reaching its determination without any advance notice or opportunity to be heard.

## PRAYER FOR RELIEF

For the foregoing reasons, the plaintiffs respectfully ask the Court to enter a final judgment in plaintiffs' favor declaring plaintiffs' rights as follows:

a) A final judgment declaring that the Act does not facially violate Title VII;

b) A final judgment declaring that the Act does not facially violate Title IX;

c) A final judgment declaring that the Act does not facially violate VAWA;

d) A final judgment declaring that the Department's attempt to enforce its erroneous interpretation of those federal statutes against North Carolina violates the separation of powers required by the United States Constitution;

e) A final judgment declaring that the Department's attempt to enforce its erroneous interpretation of those federal statutes against North Carolina violates the Tenth Amendment to and other federalism provisions in the United States Constitution;

f) A final judgment declaring that the Department's attempt to enforce its erroneous interpretation of those federal statutes against North Carolina violates section 706 of the Administrative Procedure Act;

g) An award of attorneys' fees and costs;

h) Any other relief to which plaintiffs are entitled.

Respectfully submitted,

By: /s/ S. Kyle Duncan

S. Kyle Duncan*
Gene C. Schaerr*
Schaerr | Duncan LLP
1717 K Street NW, Suite 900
Washington, DC 20006
202-787-1060
E-mail: kduncan@schaerr-duncan.com
DC Bar No. 1010452
E-mail: gschaerr@schaerr-duncan.com
DC Bar No. 416638
*Attorneys for Plaintiffs*

*Appearing Pursuant to Local Civil Rule
83.1; notice of appearance to be filed*

May 9, 2016

By: /s/ Robert D. Potter, Jr.

Robert D. Potter, Jr.
Attorney at Law
2820 Selwyn Avenue, #840
Charlotte, NC 28209
704-552-7742
E-mail: rdpotter@rdpotterlaw.com
NC Bar No. 17553
*Local Civil Rule 83.1 Counsel for
Plaintiffs*